Tony **CAMPOS, et al., Plaintiffs,**

v.

**CITY OF BAYTOWN, et al.,
Defendants.**

·Civ. A. No. H–85–1021.

United States District Court,
S.D. Texas,
Houston Division.

Jan. 5, 1987.

Baytown, Texas. These citizens allege that as a result of the manner in which City Council elections are conducted, on an at-large basis, minorities do not have an equal opportunity to participate in the political processes and to elect candidates of their choice. A court trial was held beginning on September 8, 1986.

## A. FINDINGS OF FACT

1. The City of Baytown is located in Harris County, Texas. The population of Baytown according to the 1980 census is 56,917. Defendants' Exhibit 5.

2. Of this total population, 9348 are Hispanic and 5096 are Black. Hispanics constitute 16.42% of the population of Baytown and Blacks constitute 8.95%. The combined minority population is 14,444, or 25.4% of the total population of Baytown. Def. Ex. 6.

3. Baytown City Council elections are currently held on an at-large basis. Citizen's vote at-large for six council members and a mayor. A candidate for any position must receive majority of votes to be elected. Def. Ex. 18. The at-large voting system was originally instituted in 1947 for the purpose of unifying the town and to prevent provincialism that could be caused by separate districts. Blacks were disenfranchised in Texas in 1947, therefore the effect of an at-large voting system upon minorities was not taken into account.

4. No minority has been elected to the Baytown City Council. Four different minority candidates have run in eight separate races. These four candidates were Tony Campos, Joe Gonzalez, Ruby Hardy and Mario Delgado. Plaintiffs' Exhibit 8.

5. The court finds the minority population in Baytown to be relatively compact and insular. Census data from 1980 reflects that Blacks and Hispanics primarily reside in the southern portion of Baytown. Many of the census tracts with a percentage of minority population are identical for Blacks and Hispanics. For instance, the tract with greatest percentage of Hispanics, tract 264, is also the tract with the highest percentage of Blacks. Tracts 265,

William L. Garrett, Dallas, Tex., Rolando L. Rios, Southwest Voter Registration & Education Project, of counsel, Jose Garza, Judith Sanders–Castro, Mexican American Legal Defense and Educational Fund, San Antonio, Tex., Frumencio Reyes Houston, Tex., for plaintiffs.

Stephen C. Oaks, Mueller, Oaks & Hartline, Houston, Tex., Randall B. Strong, City Atty., City of Baytown, Baytown, Tex., of counsel, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGLETON, District Judge.

This cause of action was brought by a group of minority citizens who reside in

267.01, 267.03, 273, 272, 269.02, and 268 also have substantial population of both Blacks and Hispanics. Many of these tracts are contiguous as well. Def. Ex. 6C & 6D, maps. Another way to examine compactness is to determine what percent of a minority population lives in a geographically confined area. The court finds that 64.62% of all Blacks in Baytown live in tracts 273, 264, 272, 267.01, 267.03 and 268. With the exception of tract 268, these tracts are contiguous and located in the southern and southwestern part of town. The court also finds that 58.1% of all Hispanics in Baytown reside in tracts 264, 272, 273 and 271. These tracts are contiguous and located in the southern part of town. Pl.Ex. 10 and 11.

6. Plaintiffs created hypothetical single member districts within Baytown using existing precinct boundaries. Using vote totals from those precincts composing the new districts, the minority candidates won in the hypothetical districts. Pl. Ex. 1–4.

Testimony of plaintiffs witnesses Tony Campos, Vernon Shields and Mario Delgado also tends to show minority political cohesiveness. Campos and Delgado both testified to the fact that they would have won their elections if they had been held in one of the hypothetical districts. Campos, Shields and Delgado all testified to Blacks and Hispanics working together on political campaigns, and that Blacks and Hispanics had similar concerns over political issues. The court does not find credible the testimony of defendants witnesses Mr. Breames or Reverend Davis. Each of these witnesses was only familiar with precinct 248. Reverend Davis does not reside in Baytown and Mr. Breames had considerable difficulty understanding counsels' questions and could not distinguish an at-large voting system from a single member district.

7. The court finds that racial polarization exists. Racial polarization is the situation where minority voter votes for a candidate who is a member of that minority, and conversely, Whites do not vote for the minority candidate. Regression analysis performed on City Council races in Baytown where a Minority was a candidate illustrate racial polarization. Pl. Ex. 15.

Regression analysis is a method of analyzing statistics to determine if certain factors are related and to what degree they are related. Regression analysis uses a sample to generalize about a larger group. Here, plaintiffs' expert conducted regression analyses on election results in six elections, two of which were school board elections. Plaintiffs' expert used a computer to generate a graph or plot of points along two axes. The vertical axis is the proportion of votes cast for the minority candidate and the horizontal axis is the proportion minority of the voting population. The regression analysis generates a plot of points from data entered into the computer, and a line through these points most accurately describing that configuration. It is the correlation coefficient of this line, r, the slope of the line, and the statistical significance of the r value that are the operative values of regression analysis. The correlation coefficient, r, has a value anywhere from zero to one or zero to negative one. Perfect correlation, here absolute racial polarization, would result in an r of zero. Complete reverse polarization or negative correlation would result in an r of negative one. The significance value reflects the probability that an r as high as was found would occur by chance if in fact there were no correlation at all. A significance factor of .05 or lower makes r a reliable value. Another important value is the "intercept", or where the line describing the plotted points crosses the vertical axis. In this case the intercept value describes the degree of white support for the minority candidate.

In Mario Delgado's race for City Council against Perry Simmons, the regression analysis showed a correlation coefficient of .92, slope of .98, and a significance of .000. This indicates a very strong correlation between Hispanic voters and votes for Mario Delgado. In addition, the intercept showing white support was only .36. Similarly, in Tony Campos' race in 1984 for City Council, the regression analysis showed a correlation coefficient of .86, a slope of 1.17 and a significance of .000.

Again, these results show a very strong correlation between Hispanic voters and votes for Campos. The intercept in this analysis was .26.

The analysis performed on the Joe Gonzalez race in 1976 showed a correlation coefficient of .78, slope of .65 and significance of .0027. Although these figures do not show as high a correlation as in the Delgado and Campos races, a correlation still exists linking Hispanic voters to votes for Gonzalez. White support was very low with an intercept of .04.

The analysis performed on the 1979 Ruby Hardy race showed a correlation coefficient of .78, slope of .80 and a significance of .0009. These results show a strong correlation between Black voters and votes for Hardy. Again, white support was very low with an intercept of .06.

Plaintiffs' expert also performed regression analysis on two school board races involving the black candidate David Smith. These races were the general election and runoff in 1984. The analysis generated an r of .90, slope of .78 and significance of .000 in the general election and an r of .89, slope of .70 and significance of .000 in the runoff. These are very high r values with excellent statistical significance. The correlation between votes for Smith and proportion of Black voters is very strong. The intercepts of these two analyses were .2 and .41 showing greater white support in the runoff. Pl.Ex. 15.

In addition, plaintiffs' expert also conducted regression analysis relating ethnic composition of a precinct (proportion minority) to proportion of voters received by a minority candidate. These analyses differ from those above where the analyses focused on one minority population, Black or Hispanic, while these analyses focus on a combined minority population.

The analysis performed on Mario Delgado's council race in 1986 generated an r value of .69, slope of .46 and a significance of .0031. This is quite a high correlation with good statistical significance. The intercept was .37. The analysis performed on Tony Campos' race in 1984 yielded an r value of .52, slope of .33 and significance of .0456. Although this is the lowest r value introduced into evidence and the significance value is quite high, plaintiffs' expert testified that a correlation does exist and is statistically significant. White support was low with an intercept of .28. The Ruby Hardy race was also analyzed and generated an r value of .85, slope of .75 and significance of .0002. This is a very high correlation and excellent statitical significance. White support was very low with an intercept of .02. Plaintiffs' expert also analyzed David Smith's general election and runoff for the school board in 1986. This analysis generated an r value of .90, slope of .93 and significance of .0000 in the general election and in the runoff an r value of .88, a slope of .72 and a significance of .0000. These correlations are very high and the statistical significance is excellent. The intercepts were .15 and .37 showing an increase in white support in the runoff. Pl.Ex. 19. Therefore, the regression analysis illustrates clear correlation between proportion of votes received by a minority candidate and the proportion minority of precinct voters. This correlation exists both in the instance where the expert regressed the proportion of voters received by a minority candidate on the proportion of a specific minority, Black or Hispanic, of precinct voters and where the expert performed the analysis using the proportion of combined minorities of precinct voters on the horizontal axis. In addition, white support was universally low with all intercept values lower, in most cases much lower, than .41.

8. The court also finds the existence of white bloc voting. In seven precincts in which Whites constituted greater than 90% of the population, Delgado lost all districts in 1986 and Campos lost all districts in 1984. In addition, David Smith lost all districts in his 1984 general race for a position on the school board, and lost six out of seven in the runoff. The seventh precinct was somewhat irrelevant because part of that precinct is outside of Baytown. In that precinct as a whole, Smith won in the runoff. Pl.Ex. 18.

9. The court finds that the preferred candidate of minority voters is a minority candidate. Testimony of plaintiffs' witnesses, Vernon Shields in particular, reflected this finding. In addition, Plaintiffs' exhibits showed that minority voter turnout increased dramatically in the years when a minority candidate was running for council. Pl.Ex. 20. This indicates that minorities have significantly more interest in White versus Minority races than White versus White races. This court finds that the White versus White races that defendants requested this court to examine are not probative of minority preference.

10. The court finds that Minorities in Baytown exhibit lower socio-economic factors than Whites in Baytown. In areas of education, household income, percent below poverty line, occupational status and unemployment, Blacks and Hispanics were markedly different from their white counterparts. Plaintiffs' evidence on education show that 17% of Whites, 7% of Blacks and 4% of Hispanics had a college degree, and 29% of Whites, 47% of Blacks and 63% of Hispanics had less than a high school education. Plaintiffs' evidence on household income shows that 14% of Whites, 3% of Blacks and 7% of Hispanics make more than $40,000.00 a year. On the other hand, 14% of Whites, 29% of Blacks and 21% of Hispanics make less than $10,000.00 a year. In addition, only 6.7% of Whites are below the poverty line, while 22.3% of Blacks and 19.6% of Hispanics are below the poverty line. In illustrating occupational status, plaintiffs divided occupations into two groups: first, a group including service occupations, handlers, equipment cleaners, helpers, and laborers; and second, a group including executive, administrative, managerial, professional and specialty occupations. Twenty-two percent of Whites, 10% of Blacks and 7% of Hispanics in Baytown held jobs in the second group, while 11% of Whites, 31% of Blacks and 33% of Hispanics held jobs in the first group. Finally, in Baytown, 4.2% of Whites are unemployed while 9.6% of Blacks and 7.2% of Hispanics are unemployed. Pl.Ex. 14.

11. The court finds that both Blacks and Hispanics would benefit by the creation of single member districts similar to those proposed by the plaintiffs. Defendants have expressed concern for what they term "black submergence" in the larger hispanic population in the proposed single member districts. In plaintiffs' proposed plans, Blacks would constitute approximately 22%, 25% and 27% of the new proposed districts compared with the Hispanic composition of 50%, 51% and 49% respectively. Pl.Ex. 5, 6, and 7. Blacks would be a smaller percentage of the district population than Hispanics, but all the proposed districts considerably exceed the 8.95% of Blacks in Baytown as a whole. Blacks, too, will have markedly greater voting power in one of the proposed single member districts than in Baytown as a whole.

12. The court finds that precinct 248, employed by defendants in an extreme case analysis, has too many characteristics that make it unpersuasive as an indicator of black preference. Precinct 248 is 89% black and therefore it is used as a barometer for the black vote. Pl.Ex. 13. Defendants have shown that Precinct 248 voters prefer white candidates to minority candidates. Def.Ex. 11. However, precinct 248 has the smallest total population, 701 people, of all the precincts. The next largest, precinct 12, has more than twice the population of precinct 248. The largest precinct, precinct 28, has a population of 7,396. The black population of precinct 248 is 624 persons while the total black population for Baytown is 5096 persons. Precincts 28 and 102 each has a lower percentage of Blacks than 248 but has a greater number of Blacks. In addition, registered voters in precinct 248 number only 347. The greatest number of those who have ever voted was 90 in 1984. Def.Ex. 34. Therefore, it is difficult for this court to draw broad generalizations about black voters in Baytown from black voters in precinct 248.

13. The court finds that the City of Baytown has been responsive to the needs of minorities in several ways. The City of Baytown employs and has employed many Blacks and Hispanics. The total percentage of minority employees in 1985 was 24.6%. Def.Ex. 20. Several minorities

have been appointed to various boards and commissions in Baytown. Def.Ex. 21 & 22. In addition, the numbers of housing rehabilitation projects and expenditures for rehabilitation in District 1, a minority district, far exceeds the rehabilitation and expenditures in other districts. Def.Ex. 23 & 24. All streets and drainage improvements from 1979 to 1985 have occurred in District 1. Def.Ex. 26. In addition, the City Council has entertained and/or adopted motions and resolutions effecting the well-being of minorities on issues such as the revision of the City Charter in 1969, the hiring of unskilled workers, an affirmative action plan, a neighborhood clean-up program, and a street improvement plan. Def.Ex. 27–31.

## B. CONCLUSIONS OF LAW

1. This case is brought under § 2 of the Voting Rights Act which reads as follows:

(a) No voting qualification or prerequisite to voting or standard practice, or procedures shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in § 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

■ 2. Section 2 was amended to its present form in 1982. The 1982 revision established that a violation of § 2 could be proven by showing discriminatory *effect* and that discriminatory *intent* need not be proven. S.Rep. No. 97–417, 97th 2nd Sess. 28 (1982), *reprinted* in 1982 U.S.Code Cong. & Admin.News, 177, 205. The question asked by the revised § 2 is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id.*

3. Congress intended this question to be answered by examination of seven *Zimmer* factors, so called for a case of the same name. *Zimmer v. McKeithen* 485 F.2d 1297 (5th Cir.1973), *aff'd sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). These factors are: (1) the history of voting-related discrimination in the political subdivision; (2) the extent to which voting in the elections of the political subdivision is racially polarized; (3) the extent to which the political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment and health which impair their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction. S.Rep. No. 97–417, 97th Cong.2d Sess. 28–29 (1982) *reprinted in* 1982 U.S.Code Cong. & Admin.News, 205–07. Another factor noted by Congress is the responsiveness of elected officials in the political subdivision to needs of minorities. *Id.* Other factors may be considered by courts, but

no single factor or combination of factors is particularly determinative. *Id.*

4. In the context of multi-member districts or at-large election schemes, however, a special conjunction of circumstances must occur. *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986). "Stated succinctly, a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Id.* Broken down into individual factors, the minority group must prove: (1) that it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that it is politically cohesive; and (3) that the white majority votes sufficiently as a bloc to enable it in the absence of special circumstances, usually to defeat the minority's preferred candidate. *Id.*, 106 S.Ct. at 2766–67. The second and third factors are elements of the larger phenomenon of racially polarized voting. *Id* at 2769. This Court has determined that these three factors are the threshold consideration, after which other *Zimmer* factors can be taken into account.

5. The first factor, that the minority is sufficiently large and geographically compact to constitute a majority in a single member district, has been proven by the plaintiffs. Plaintiffs created three districting plans in which the combined minority population created a majority in a proposed single member district. Pl.Ex. 5–7. Plaintiffs also showed the Court four hypothetical districts composed of existing precincts in which minority candidates would have won their elections. Pl.Ex. 1–4. In addition, the Court has examined maps depicting concentrations of minority population and found that the minority population is sufficiently compact. Def.Ex. 6A–D.

6. Plaintiffs have proven that the Minorities in Baytown are politically cohesive. Plaintiffs' hypothetical districts prove cohesiveness sufficient to elect minority candidates within the hypothetical districts. Pl.Ex. 1–4. Plaintiffs' witnesses also testified to minority political cohesiveness. Political cohesiveness, as an element of racially polarized voting, has also been illustrated with regression analysis. Plaintiffs have proven minority political cohesiveness with its regression analysis, both within minority groups and across minority groups. Pl.Ex. 15 & 19. In the analyses performed on specific minorities, Plaintiffs' expert found a high correlation between the proportion of votes received by the minority candidates and the proportion of minority voters. Pl.Ex. 15. This illustrates a political cohesiveness within one minority group, Black or Hispanic. Plaintiffs' expert also found high correlations when he regressed the proportion of votes received by the minority candidate on the proportion of combined minority voters, Black and Hispanic. Pl.Ex. 19. Only one race in this second analysis is a relatively low correlation coefficient. The second regression analysis illustrates political cohesiveness between Blacks and Hispanics ·in voting for candidates of either race.

7. Plaintiffs have also proven the third element of the threshold inquiry, white bloc voting. Plaintiffs have shown that in all city council races in which a minority candidate has run, the minority candidate has lost. Pl.Ex. 12. In addition, in seven precincts with greater than 90% white population, Mario Delgado lost every one in 1986, Tony Campos lost every one in 1984, and David Smith, running for school board, lost every one in 1984 with the exception of precinct 386 in which he lost the general election and won the runoff. It should be noted, however, that a portion of precinct 386 is outside of Baytown. Pl.Ex. 13. White bloc voting is a necessary corollary to minority polarized voting. Plaintiffs' regression analysis, in addition showing a correlation between votes for minority candidates and proportion of minority population also shows the degree of white support in the "intercept" value. Intercept values ranged from a low of .02 to a high of .41, showing white support for minority candidates ranging from 2% to 41%. The values are quite low and indicate a large majority of white voters, in some instances a vast majority of white voters, supporting white candidates.

8. The Court concludes that Plaintiffs have proven the threshold elements of compactness, cohesiveness and white bloc voting. Defendants have presented a very different view of elections in Baytown. The primary difference between the evidence presented by plaintiffs and defendants is that defendants request that the Court examine all elections in the past several years and not just elections where a minority was a candidate. Def.Ex. 9 & 10. The underlying premise for this request is defendants' contention that a preferred candidate of a minority voter is not necessarily a minority candidate. Defendants ask this Court to find that precincts where a substantial number of minorities reside have a preferred candidate in every election regardless of whether a minority is running. The court would then have to determine in every election whether the minority's preferred candidate had won or lost. The conclusion the defendants want this Court to reach is that minorities have seen their preferred candidates elected at least 75% of the time. Def.Ex. 9. This court cannot accept defendants' premise or their argument for the following reasons.

First, the Supreme Court recognizes that the preferred candidate of a minority is a minority candidate. *Thornburg* at 2776 (plurality). The Court states that that was the situation in the case before them. *Id.* Of course, the Court is careful to point out, the race of the candidate is not the important factor, rather the status of the candidate as the chosen representative of a particular racial group is crucial. *Id.* Nevertheless, it is obvious to this Court that race and status can coincide.

In the case before this Court, race and status do coincide. The testimony of plaintiff's witness, Vernon Sheilds, indicates that he prefers minority candidates. Defendants did not controvert this testimony or counter it with witnesses of their own. Additionally, the court found that minority voter turnout increased markedly in years when a minority was running. Pl.Ex. 20.

Another reason for not adopting defendants' view of the evidence is that all defendants' results depend entirely upon the relatively few occasions upon which minorities chose to run for city council. Had minorities run more often, defendants results would have been poorer and vice versa. This court cannot consider evidence and results from evidence that depends so heavily on such fortuitous events. Additionally, the relative infrequency of minority candidacy may itself be a factor of race, making defendants request of this court even more suspect.

9. Now the court turns to the *Zimmer* factors that have been proven in this case. One of the most important of these is the existence of racially polarized voting. Since racially polarized voting shows minority cohesiveness and white bloc voting and both of these elements were discussed above in the courts threshold considerations, the discussion here will be limited. Plaintiff's expert showed the existence of racially polarized voting in Baytown through the use of regression analysis. Pl.Ex. 15 & 19. Plaintiff's exhibit 15 showed very high correlation coefficients and corresponding low significance values. A strong correlation across several elections was proven between votes for minority candidates and the proportion of minorities of the same race in a precinct. Plaintiffs exhibit 19 also showed high correlation coefficients and good overall significance levels. Plaintiffs thereby proved a strong correlation between votes for minority candidates and proportion of combined minorities in a precinct.

Defendants attempted to undermine the credibility of plaintiffs expert, Dr. Brischetto, by calling the Court's attention to Judge Higginbotham's concurrence in a denial of a petition for panel rehearing. *Jones v. City of Lubbock,* 730 F.2d 233 (5th Cir. 1984). In his concurrence, Judge Higginbotham severely questioned Dr. Brischetto's statistical methods. This court believes Dr. Brischetto has been vindicated by the Supreme Court in *Thornburg* where the State of North Carolina adopted Judge Higginbotham's skepticism. *Thornburg,* 106 S.Ct. at 2773 n. 32. After a lengthy analysis of the State's arguments, *id.* at 2772–79, the Court concludes:

In sum, we would hold that the legal concept of racially polarized voting, as it relates to claims of vote dilution, refers *only* to the *existence of a correlation* between the race of voters and the selection of certain candidates. Plaintiffs need not prove causation or intent in order to prove a "prima facie" case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent.

*Id.* at 2779 (emphasis added).

10. The next *Zimmer* factor of importance to this case is the extent to which minority group members bear the effects of past discrimination in education, income, poverty, occupational status, and unemployment. Minorities in Baytown fall significantly behind Whites in these categories and the Court concludes that the minorities in Baytown carry with them the results of past discrimination to a substantial extent. Pl.Ex. 14.

11. Another *Zimmer* factor to be considered in this case is the extent to which members of a minority group have been elected to public office. No minority has been elected to Baytown City Council since its incorporation in 1947. One minority, David Smith, has been elected to the Goose Creek Independent School District Board.

12. The final factor to consider is the responsiveness of elected officials to the particularized needs of members of the minority group. Defendants have introduced a wealth of evidence on this issue and plaintiffs do not contest it. Defendants have shown that the City of Baytown has been responsive to the needs of minorities in areas of minority employment, appointments to boards and commissions, housing rehabilitation, streets and drainage improvements and that the council has dealt directly with issues of concern to minorities such as city charter amendments, CETA programs, affirmative action plans and neighborhood cleaning. Def.Ex. 20–31.

Although the City's efforts in these areas over the years have been commendable, this single factor alone is not sufficient to mitigate the seriousness of the many results of past discrimination that the minori-

ty citizens of Baytown must bear—in particular their inability to participate fully in the electoral system in Baytown.

13. Therefore, the court concludes that a Section 2 violation does exist, impairing the ability of the minority citizens of Baytown to elect candidates of their choice.

Baytown City Council shall present this court with a plan including a minority single-member district, in which minority voters shall be the majority, in accordance with an order to be entered by the court, within 60 (sixty) days of the date of that order.

### ORDER

In accordance with Findings of Fact and Conclusions of Law entered on this day in the above-captioned matter, it is hereby

ORDERED, ADJUDGED and DECREED that the City of Baytown shall present this court, for approval, a voting district plan that shall include a single-member district. It is

FURTHER ORDERED that the single-member district must be a minority district; that is, one that is more than 50% minority, combined Black and Hispanic, in population. It is

FURTHER ORDERED that the above plan shall be submitted to the court for approval within sixty (60) days of the entry of this Order.