Janine WINDY BOY, Gary Howey, Norma Bixby, Carlene Old Elk, Dale Old Horn, James Ruegamer Mark Small, Clo Small, Plaintiffs,

v.

COUNTY OF BIG HORN, Dick Gregory, John Lind, John Koebbe, Donald Beary, Lambert Vandersloot, Harvey Pitsch, Michael Downing, James Herbel, Roberta Snively, Rod Svee, Defendants.

No. CV 83–225–BLG–ER.

United States District Court,
D. Montana,
Billings Division.

June 13, 1986.

Jeffrey Renz, Billings, Mont., Laughlin MacDonald, Atlanta, Ga., for plaintiffs.

John W. Ross, Michael P. Heringer, Anderson, Brown, Gerbase, Cebull & Jones, P.C., Billings, Mont., for defendants.

## MEMORANDUM OPINION

RAFEEDIE, District Judge, Sitting by Designation.

### I. INTRODUCTION

Plaintiffs are American Indians and others who challenge the at-large system of voting for Board of Commissioners and school board in Big Horn County, Montana. Their claims arise under Section 2 et seq. of the Voting Rights Act, 42 U.S.C. § 1973 et seq., the Fourteenth and Fifteenth Amendments to the Constitution, and 42 U.S.C. § 1983. Plaintiffs claim at-large voting denies them the equal opportunity to participate in the political process and to elect representatives of their choice.

Big Horn County, Montana is 5,023 square miles, larger than the State of Connecticut. According to the 1980 census, 11,096 people live in the county. Fifty-two and one-tenth (52.1) percent are white, 46.2 percent are American Indian, and 1.7 percent are of other races. There are 7,308 residents of voting age of whom 59 percent are white and 41 percent are Indian and current registration figures reflect a similar breakdown among registered voters. The Indians are members of the Crow and Northern Cheyenne tribes and ninety percent of them live on tribal reservations. The largest town in the county and the county seat is Hardin. According to the census, 83.6 percent of Hardin's residents are white and 13.2 percent are Indian. Nearly half of the white residents of the county live in Hardin.

Big Horn County is governed by a three-member Board of Commissioners. The county is divided into three districts and one commissioner resides in each district. Elections are held at-large with all county voters eligible to vote in each Board of Commissioners' election. Commissioners serve for six year staggered terms so that in November of every even numbered year one Commissioner is elected. The elections are partisan with open party primaries held in June before the November election. No Indian has ever been elected to the Board of Commissioners.

The school boards at issue in this case are those for Elementary School District 17H and High School District 1. These school districts are smaller geographically than the county as a whole. Both districts include the town of Hardin. District 17H is governed by a five-member Board of Trustees. Trustees are elected at-large and may live anywhere in the district. The terms are for three year staggered terms with school board elections held every year in April. The five trustees for District 17H, together with an elected sixth trustee, comprise the Board of Trustees for District 1. One Indian has been elected to the Board of Trustees of District 17H.

Plaintiffs in this case are two members of the Crow tribe, three members of the Northern Cheyenne tribe, two wives of tribe members, and a white member of the Board of Commissioners. Defendants are the county, members of the Board of Commissioners, the Boards of Trustees of Districts 17H and 1, and the Superintendents of Schools for the county and Districts 17H and 1. The individual defendants are being sued in their official capacities. Subject matter jurisdiction exists pursuant to 42 U.S.C. § 1973 and 28 U.S.C. §§ 1331 and 1343. Venue is proper in the district of Montana.

## II. AT-LARGE ELECTIONS AND THE VOTING RIGHTS ACT

The impact that an at-large voting system has on groups that do not constitute a voting majority of a jurisdiction has long been recognized:

At-large voting schemes ... tend to minimize the voting strength of minority groups by permitting the political majority to elect *all* representatives of the district. A distinct minority, whether it be a racial, ethnic, economic, or political group, may be unable to elect any representatives in an at-large election, yet may be able to elect several representatives if the political unit is divided into single member districts.

*Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982) (emphasis supplied). Despite this aspect of at-large systems of voting, at-large elections are neither *per se* unconstitutional nor *per se* a violation of the Voting Rights Act. *Id.; U.S. v. Marengo County Com'n,* 731 F.2d 1546, 1564 (11th Cir.), *appeal dismissed, cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984). Only when at-large elections dilute minority votes so that minorities do not have an equal opportunity to participate in the political process is the Voting Rights Act violated. Only when at-large voting systems are purposefully established or maintained to dilute minority voting strength are at-large systems unconstitutional. The statutory issues in this case must be considered first. *Escambia County, Florida v. McMillan,* 466 U.S. 48, 104 S.Ct. 1577, 1579, 80 L.Ed.2d 36 (1984).

The statutory language of Section 2 of the Voting Rights Act, as amended in 1982, states in pertinent part:

(a) No voting ... procedure shall be imposed ... in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color [or status as a language minority].

(b) A violation ... is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by [minorities] in that [minorities] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office ... is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

When determining whether a voting system results in the dilution of minority votes, courts do not consider the statutory language in a vacuum. The legislative his-

tory of the 1982 amendments to the Voting Rights Act discusses seven objective factors a court must review in Section 2 cases. They are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which the members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

1982 U.S.Code Cong. & Ad.News at 177, 206–07 (footnotes omitted). These factors were articulated by the Fifth Circuit in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (examining at-large elections), *aff'd on other grounds sub nom. East Caroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam), based on the framework established by the Supreme Court in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). Congress' intent in amending the Voting Rights Act in 1982 was to require courts to consider these *Zimmer* factors in voting rights cases to determine whether vote dilution is occurring.

Congress also cited two other factors that might have limited relevance:

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

[9.] whether the policy underlying the ... [voting] procedure is tenuous.

1982 U.S.Code Cong. & Ad.News at 207 (footnotes omitted); *see Jones v. City of Lubbock*, 727 F.2d 364, 379, *rehearing denied*, 730 F.2d 233 (5th Cir.1984).

While specifying these nine factors for consideration, Congress did not limit courts to consideration of only these factors nor did Congress require that plaintiffs prove a certain number of factors to prevail. The legislative history states: "While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution. The cases demonstrate, and the Committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or another." 1982 U.S.Code Cong. & Ad.News at 207 (footnote omitted); *see generally U.S. v. Marengo County Com'n.*, 731 F.2d 1546, 1563–66 (11th Cir. 1984); *Major v. Treen*, 574 F.Supp. 325, 350–51 (E.D.La.1983) (three-judge court).

## III. APPLICABILITY OF SECTION 2 TO AMERICAN INDIANS

■ Although this is apparently only the second time that American Indians have challenged a voting system under Section 2 of the Voting Rights Act, *Buckanaga v. Sisseton Independent School District*, Civil No. 84–1025 (N.D.S.D. March 5, 1985) [Available on WESTLAW, DCTU database], Indians are clearly a protected group under the Act. In 1975 Congress extended coverage to language minorities including American Indians, Asian Americans, Alaska Natives, and those of Spanish heritage. 42 U.S.C.

§§ 1973b(f)(2) and 1973aa–1a(e). Congress found that a "pattern of educational inequity exits with respect to children of Indian . . . origin." 1975 U.S.Code Cong. & Ad.News at 774, 795. Congress also found "overwhelming evidence . . . [of] voting problems encountered by language minority citizens." *Id.* at 797. "The definition of those groups included in 'language minorities' was determined on the basis of the evidence of voting discrimination." *Id.* There was "substantial" evidence of discriminatory practices that affected the right of Indians to vote. *Id.* Congress fine-tuned one of the provisions of the Act applicable to Indians in certain political subdivisions in the 1982 Amendments by providing that instructions to Indian voters may be oral if the "predominate language is historically unwritten . . ." 42 U.S.C. § 1973b(f)(4) (1982). Thus Congress has directed that this court apply the Voting Rights Act to challenges to voting systems that are brought by American Indians.

## IV. APPLICATION OF SECTION 2

Despite the length of the trial, the briefs, and the decision in this case, the ultimate remedial question in this case is a narrow one—whether local officials should be elected by district or at-large. The issue is a familiar one to Big Horn County residents, as government study commissions have twice in the last ten years recommended after hearings and study that the at-large system be dropped and a districting system be adopted. Despite the narrowness of this question, the factors that the court must consider in reaching a decision in this case are global. It is necessary that allegations of discrimination be made and refuted, that divisive and hard fought election contests be relived, and that controversial issues concerning the relationship between Indian tribes and local government be reexamined. Such an inquiry is, unfortunately, a painful and divisive process for the citizens of Big Horn County. Years of frustration and concern have been vented during the litigation as plaintiffs and defendants presented their views to this court, seeking an impartial determination of issues that are the result of the long and difficult struggle between whites and Indians in this country. The dual status of Indians as both United States citizens and as members of sovereign tribes that are self-governed and not subject to full control by state and local government has long presented conflicts over land, mineral, and fishing rights, taxation, and the authority of tribal, state, and federal courts. To further complicate the situation, the citizens of Big Horn County, white and Indian alike, are victims of shifting court decisions and federal policies over the last one hundred years concerning the unique status of American Indians in the United States and their relationship to the non-Indian residents of the counties and states where their reservations are located. *See e.g. Montana v. U.S.*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (Big Horn River owned by State of Montana), *rev'g.*, 604 F.2d 1162 (9th Cir.1979) (Big Horn River held in trust by U.S. for benefit of Crow Tribe).

It must be remembered that this one decision under the Voting Rights Act does not answer any of the difficult questions raised by issues just mentioned. These questions will continue to be part of the public debate in Big Horn County in the years to come. Despite the wide ranging inquiry this court has made, ultimately this case turns on the rather straightforward task of analyzing the objective factors that Congress considers appropriate for analysis to determine whether at-large elections dilute the voting strength of American Indians making elections by district preferable and required under the law.

The *Zimmer* factors are examined below.

### A. *Official Discrimination*

■ A key factor this court must consider is the extent of any official discrimination in Big Horn County that has touched the rights of Indians to vote or otherwise participate in elections. Plaintiffs presented substantial probative evidence that the

right of Indians to vote has been interfered with, and in some cases denied, by the county.

Numerous witnesses testified that the names of Indians who had registered to vote did not appear on voting lists in 1982 and 1984 denying those Indians the opportunity to vote in elections held in those years. (Testimony of: Manny Langdon, Pastor of Baptist Church; Tyronne Ten Bear; Leo Hudetz; Dessie Bad Bear, Election Judge; Clo Small). Other testimony indicated that Indians who had voted in primary elections had their names removed from voting lists and were not allowed to vote in the subsequent general election. One witness testified that he registered both Indian and white voters, but only Indians were omitted from voting lists. These irregularities coincided with hard fought election campaigns and a major Indian voter registration drive.

There was also testimony that the right to register to vote was interfered with during this period. An Indian candidate for the state legislature testified that she was refused voter registration cards by the county in 1984 and had to obtain them at the State Capitol. Another Indian testified that he was given only a few voter registration cards and when he asked for more was told that the county was running low. Having driven a long way to get the cards, he asked his wife, who is white, to go into the county building and request some cards. She did and was given about 50 more cards than he was. (Testimony of Mark Small and Clo Small).

The witnesses who testified about voter registration and voting irregularities were credible. Defendants' witness Lippert, who attempted to explain why registration cards were not available and why names were dropped from voting lists did not convince the court that Indian voting rights were not interfered with. For Indians who could not register or could not vote, it does not much matter whether there was a specific intent to interfere with their rights or simply an inability or unwillingness on the part of the county to make sure Indians

rights were protected. No other conclusion can be reached than that the right of some Indians to register and to vote has been seriously interfered with by the county and there was enough testimony to make it appear that it was not an isolated occurrence. This testimony was clearly the most important in this case for it tends to show an intent to discriminate against Indians.

Other testimony confirmed irregularities in distribution of registration cards. The election administrator numbered cards given to Indians and told them they could not get more until the numbered cards were returned. There was no evidence that a similar system was used for whites. Additionally, there was testimony that the administrator became hypertechnical as Indian registration increased and looked for minor errors in registration applications and used them as an excuse to refuse to allow registration. The registration cards require voters to list their township, section and range, information not always known to potential voters making registration difficult. The court was not persuaded by defendants' explanation that these acts were caused by a shortage of registration cards and an increased concern about voter fraud.

Other evidence of official discrimination touching on the right to participate in elections concerned the failure of the county to appoint Indians to county boards and commissions. Very few Indians have been appointed to the approximately one hundred positions on these boards and commissions, positions that are often a stepping stone to public office. There have never been more than two or three Indians serving in any of these positions at any one time and testimony was received that only 14 Indians have been appointed out of the hundreds of appointments that have been made since 1924. Both Commissioner Ruegamer and former Commissioner Gregory testified that there was discrimination in the appointment process. Ruegamer's nominations of Indians for positions have generally failed for lack of a second on the Board

of Commissioners. Since the inception of this case, more Indians have been appointed, but the lack of such appointments in the past has interfered with the integration of Indians into the political and governmental processes of the county, limiting their ability to build coalitions which often lead to success in the political arena. There was testimony that there has been discrimination in the appointment of deputy registrars of voters and election judges limiting Indian involvement in the mechanics of registration and voting. Finally, it must be noted that in the past there were laws prohibiting voting precincts on Indian reservations and effectively prohibiting Indians from eligibility for positions such as deputy registrar.

All this evidence reflects official discrimination that has hampered the ability of Indians to participate in the political process.

### B. *Racially Polarized Voting*

■ Proof of racially polarized voting is the "keystone" of a vote dilution case under Section 2. *U.S. v. Marengo County Com'n.*, 731 F.2d 1546, 1566 (11th Cir. 1984). As the Supreme Court has commented, "Voting along racial lines allows those elected to ignore [minority] interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race." *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982).

In this case, plaintiffs and defendants disagree about the definition of the term "racially polarized voting" and consequently do not agree on whether it exists in Big Horn County. The essence of plaintiffs' argument is that when voters vote along racial lines in contests where candidates from different races oppose each other, racially polarized voting exists. Defendants argue that this is insufficient as a matter of law to support a finding of racially polarized voting. Relying on the District Court opinion in *Collins v. City of Norfolk, Va.*, 605 F.Supp. 377 (E.D.Va.1984), *aff'd,*

768 F.2d 572 (4th Cir.1985), *petition for cert. filed*, 54 U.S.L.W. 3533 (Jan. 31, 1986) (No. 85–1300), defendants contend that to show racially polarized voting plaintiffs must prove white voter backlash and that whites attempted to limit the field of minority candidates. Plaintiffs generally have the sounder view, *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982) ("bloc voting along racial lines" is racially polarized voting); *McMillan v. Escambia County*, 748 F.2d 1037, 1043 (5th Cir.1984), though there is growing support for defendants' position that simple correlations are not enough, by themselves, to prove racially polarized voting. *Jones v. City of Lubbock*, 730 F.2d 233 (5th Cir. 1984) (Higginbotham, J. concurring); *Lee County Branch of NAACP v. City of Opelika*, 748 F.2d 1473, 1482 (11th Cir.1984); *McCord v. City of Ft. Lauderdale*, 787 F.2d 1528, 1532 (11th Cir.1986).

Taking into account the recent views of the Fifth and Eleventh Circuits, this court believes that when plaintiffs can prove both a pattern of voting along racial lines and that the race of candidates is a factor in elections, racially polarized voting must be presumed, absent a showing by defendants that some other factor explains the voting pattern.

The court notes that the Supreme Court has not spoken on this issue since the 1982 amendments to the Voting Rights Act, but may do so in the coming weeks. *Gingles v. Edmisten*, 590 F.Supp. 345, 367–69 (E.D.N.C.1984), *prob. juris. noted*, 471 U.S. 1064, 105 S.Ct. 2137, 85 L.Ed.2d 495 (1985).

#### 1. Plaintiffs' Experts

Plaintiffs' evidence of racially polarized voting is a study by plaintiffs' expert Joe Floyd of recent election contests in Big Horn County in which Indians (or so-called "pro-Indian" whites) faced white opponents. Floyd analyzed three sets of elections: general elections in 1974, 1982, and 1984; school board elections in 1983, 1984, and 1985; and primary elections in 1982 and 1984. He reached the following conclusions:

In general elections 86 percent of white voters voted for white candidates and 92 percent of Indian voters voted for Indian candidates;

In school board elections 96 percent of white voters voted for white candidates and 74 percent of Indian voters voted for Indian candidates;

In primary elections 96 percent of white voters voted for white candidates and 82 percent of Indian voters voted for Indian candidates.

Looked at another way, Floyd's conclusions were that white candidates on average received 8 to 26 percent of the Indian vote and Indian candidates received 4 to 14 percent of the white vote. Indians were more likely to crossover and vote for whites than whites for Indians when primary and school board elections were examined. The opposite was true when general elections were studied.

Floyd's primary analytical tool was bivariate regression analysis (computing r-squared coefficients) which he used to determine whether there was a correlation between the number of Indian voters in a precinct and the number of votes for Indian candidates. He did the same analysis comparing the relationship between the number of white voters in a precinct and the vote for white candidates.

Floyd concluded, after studying 172 contests, that in general elections 93.2 percent of the variation in the vote for Indian candidates could be explained by the number of Indian voters and 91.5 percent of the variation in vote for white candidates could be explained by the number of white voters in those precincts.

In primary elections, 96.7 percent of the Indian candidate vote could be explained by the number of Indian voters and 90.9 percent of the white candidate vote could be explained by the number of white voters. Fifty-one primary contests were studied.

Finally, in school board elections, 87.4 percent of the Indian candidate vote could be explained by the number of Indian voters and 98.7 percent of the white candidate vote could be explained by the number of

white voters. Eighteen school board contests were studied.

Clearly there is a strong correlation between the race of the voter and the race of the candidate for which that voter votes. Indians generally vote for Indian candidates and whites for white candidates. Plaintiffs' second expert, Gordon Henderson, reviewed the Floyd study and found its methodology to be sound. Similar analysis has been used in other cases. *E.g. Major v. Treen,* 574 F.Supp. 325, 337 (E.D.La.1983) (three-judge court); *Lee County Branch of NAACP v. City of Opelika,* 748 F.2d 1473, 1481 (11th Cir.1984).

## 2. Defendants' Experts

Neither of defendants' experts directly challenges the findings of the Floyd study. Defendants' expert Craig Wilson stated: "[Floyd's] report demonstrates that Indians are more likely to vote for Indians and whites for whites ..." Defendants' expert Lauren McKinsey stated: "bivariate regression is an appropriate statistic for this kind of study [and] the Pearson's r-value discovered in applying the test are quite high and, in the limited circumstances of his data, indicate a strong relationship."

Defendants' experts did attempt to challenge the weight that should be placed on the Floyd study. Their comments and criticisms are discussed below. Significantly, though, defendants did not present a study comparable to Floyd's study to challenge Floyd's conclusions. There was no statistical analysis by defendants, computing correlation by r-squared values or by any other technique, to prove either that the correlation between race of voter and race of candidate did not exist, or that some other factor (*e.g.* income or party affiliation) could better explain the pattern of voting. Defendants' experts presented more in the way of hypothesis about voting patterns than they did in the way of proof. *Cf. Major v. Treen,* 574 F.Supp. 325, 339 (E.D. La.1983) (three-judge court) (defendants' analysis of white cross-over voting); *McCord v. City of Ft. Lauderdale,* 787

F.2d 1528, 1532 (11th Cir.1986) (defendants' multi-variate statistical analysis).

Defendants' expert Wilson attempted to show that partisanship, not race, explains voting patterns in Big Horn County. Rather than comparing the number of voters in each party by precinct with the vote for candidates of that party, Wilson simply lists the percentage results in election after election, comparing the two-party county wide vote with two-party vote in heavily Indian precincts. He concluded that the county tends to vote Democratic and the precincts with many Indian voters tend to vote Democratic by a wider margin than the county as a whole. The court does not find this analysis very helpful. It has little relevance to the question of whether racially polarized voting exists. Wilson did not compute correlations between party affiliation of voter and party affiliation of candidate. He did not fully analyze primary elections where partisanship is not a factor. For these reasons, Wilson's discussion of recent elections does not cast doubt on the conclusions of Floyd's study.

Defendants' expert McKinsey also reviewed the Floyd study, and offered criticism of it. First, McKinsey argues that Floyd's study did not prove that voters in Big Horn County were motivated by racial animus. Motivation, McKinsey contends, is a key question in this case. This question is examined below. Second, McKinsey argues that race may be a surrogate for such things as income differences, incumbency, or the residence of candidates. A theory that racial bloc voting in Big Horn County may be explained by factors other than race is not proof of that theory. Defendants did not present probative evidence on which the court can make a finding that racial bloc voting is caused by factors other than race. Third, McKinsey criticizes the Floyd study for not analyzing elections in which white candidates did not run against Indian candidates. McKinsey suggests that elections in which two white candidates ran against each other should be analyzed as well as elections where issues rather than candidates were on the ballot. This presupposes that to show racially polarized voting plaintiffs must show that Indians and whites always vote differently (*e.g.* Indians for a school bond measure and whites against it; Indians for Reagan, whites for Carter). The court does not consider this appropriate or necessary under the law. In fact, if Indians and whites did vote the same in elections where Indians and whites did not oppose each other on the ballot, but voted differently when they did, this would be strong probative evidence of racially polarized voting.

Neither of defendants' experts persuaded this court to reject the conclusions of the Floyd study, but the court does not believe the findings of the Floyd study alone are sufficient evidence on which to base a finding of racial polarized voting. Courts should not place too much reliance on r-squared analysis, such as that done by Floyd, in ruling on the issue of racially polarized voting. *McCord v. City of Ft. Lauderdale,* 787 F.2d 1528, 1532 (11th Cir. 1986); *Lee County Branch of NAACP v. City of Opelika,* 748 F.2d 1473, 1482 (11th Cir.1984). Other evidence should also be examined.

### 3. Corroborative Evidence

Defendants rely heavily on the special concurrence of Judge Higginbotham in the decision of the Fifth Circuit denying rehearing *en banc* in *Jones v. City of Lubbock,* 727 F.2d 364 *rehearing denied,* 730 F.2d 233 (5th Cir.1984) to challenge plaintiffs' proof of racially polarized voting. Judge Higginbotham's concurrence is devoted exclusively to a discussion of racially polarized voting and is worthy of careful study. Judge Higginbotham wrote:

Care must be taken in the factual development of the existence of polarized voting because whether polarized voting is present can pivot the legality of at-large voting districts. The inquiry is whether race or ethnicity was such a determinant of voting preference in the rejection of [minority] candidates by a white majority that the at-large district, with its components, denied minority voters effective

voting opportunity. In answering the inquiry, there is a risk that a seemingly polarized voting pattern in fact is only the presence of mathematical correspondence of race to loss inevitable in such defeats of minority candidates. The point is that there will almost always be a raw correlation with race in any failing candidacy of a minority whose racial or ethnic group is as small a percentage of the total voting population as here. Yet, raw correspondence, even at high levels, must accommodate the legal principle that the amended Voting Rights Act does not legislate proportional representation. More complex regression study or multivariate mathematical inquiry will often be essential to gauge the explanatory power of the variables necessarily present in a political race. Nor will math models always furnish an answer. A healthy dose of common sense and intuitive assessment remain powerful components to this critical factual inquiry. For example, a token candidacy of a minority unknown outside his minority voting area may attract little non-minority support and produce a high statistical correspondence of race to loss. Yet, one on the scene may know that race played little role at all. In sum, detailed findings are required to support any conclusions of polarized voting. These findings must make plain that they are supported by more than the inevitable by-product of losing candidacy in a predominately white voting population. Failure to do so presents an unacceptable risk of requiring proportional representation, contrary to congressional will.

\* \* \* \* \* \*

[Plaintiffs' expert] did not test for other explanatory factors than race or ethnicity as intuitively obvious as campaign expenditure, party identification, income, media use measured by cost, religion, name identification, or distance that a candidate lived from any particular precinct. There are well-established statistical methods, such as step-wise multiple regressions, to test for the relative importance of such multiple factors. Sig-

nificantly, the inference of bloc voting from this model builds on an assumption that race or national origin is the only explanation for the correspondence. It ignores the reality that race or national origin may mask a host of other explanatory variables.

730 F.2d at 234–235; *see also McCord v. City of Ft. Lauderdale, Fla.,* 787 F.2d 1528, 1532 (11th Cir.1986).

Applying Judge Higginbotham's approach to this case supports a finding of racially polarized voting. In *Jones,* as here, defendants' experts merely criticized plaintiffs' study and did not do a study of their own to rebut plaintiffs'. For that reason plaintiffs' expert's bivariate regression analysis was a sufficient basis on which to find racially polarized voting in *Jones. Id.* at 236. Moreover, in *Jones* plaintiffs' expert studied only the correlation between the number of minority voters and the vote for the minority candidate. This caused Judge Higginbotham to conclude, "A high correlation figure would show up even if the white voters split their vote 50–50, as long as the minority voters voted as a bloc. Such voting pattern obviously would not constitute polarized voting for our purposes." *Id.* at 235. Floyd's study cannot be criticized in the same way. Floyd studied both Indian voting patterns and white voting patterns. If 50 percent of the whites voted for Indian candidates, Floyd's correlation figures would have reflected that, unlike the study done in *Jones.* As stated above, Floyd concluded that, on average, only 4 to 14 percent of white voters voted for Indian candidates in Big Horn County.

This court agrees with Judge Higginbotham that a healthy dose of common sense and intuitive assessment is necessary when examining the question of racially polarized voting. A determination of this important factor in voting rights cases is not solely the province of statisticians and political scientists. It is a question of fact. Mathematical correlations and expert testimony are evidence of this fact, not

proof. Defendants argue, as did their expert McKinsey, that plaintiffs must show more than voting along racial lines (*i.e.* racial bloc voting) to prove racially polarized voting. Defendants contend that plaintiffs must show that voters are motivated by racial animus. Plaintiffs disagree, stating that proof of intent to discriminate is not required in voting rights cases, as Congress' clear intent in amending Section 2 in 1982 was to overturn the Supreme Court's decision in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) that a showing of intent was required in Voting Rights Act cases. *See Butts v. New York,* 779 F.2d 141, 154 n. 1 (2d Cir.1985) (Oakes, J. dissenting). The court believes the standard is somewhere in between the view of plaintiffs and defendants. For Judge Higginbotham the inquiry is whether race or ethnicity is a "determinant of voting preference." *Jones v. City of Lubbock,* 730 F.2d at 234. Courts should look to evidence beyond statistical correlation to determine whether race is an issue in elections or, in other words, whether politics is race conscious. High correlations create a presumption of race conscious voting, but there should be other evidence to corroborate that. *See e.g. Major v. Treen,* 574 F.Supp. 325, 338 (E.D.La. 1983) (three-judge court) (examining other evidence that supported expert testimony). Such evidence may include, as defendants have suggested, white voter backlash as well as attempts to restrict the number of minority candidates. Such corroborative evidence was presented in this case. Moreover, other potential explanations of voting patterns (*e.g.* disparities in campaign expenditures, lackluster campaigns) are not supported by the evidence in this case.

After several Indian and so-called "pro-Indian" candidates were successful in the 1982 primary, there was a strong reaction among white voters. White turnout in Big Horn County increased dramatically in the 1982 general election, up nearly ten percentage points from where it had been two years earlier, according to defendants' expert Wilson. A Bi-Partisan Campaign Committee was formed to support candidates who ran against the Indian and pro-Indian candidates. Candidates backed by this Committee, although not on the ballot, were almost elected in write-in campaigns. Registration among whites rose from 75 percent at the time of the 1982 primary to 91 percent five months later at the time of the 1982 general election. There was clearly white voter reaction to the success of Indian and pro-Indian candidates in the 1982 primary. Defendants' expert Wilson's comparison of countywide white voter turnout to statewide turnout is totally meaningless. His discussion of countywide white voter turnout in 1974 through 1984 proves plaintiffs' point that there was white voter reaction to the 1982 primary results.

Other evidence of race conscious politics came from the testimony of Indian candidates who attempted to campaign in white neighborhoods in Hardin. Many of these candidates were not well received. Some testified that whites refused to speak to them. There was substantial testimony—from whites and Indians—that it is difficult for Indian candidates to get white votes, even when these candidates are qualified and eager for white support. The testimony of observers of the Big Horn County politics confirms that it is racially polarized. When an Indian was elected Chairman of the Democratic Party, white members of the party walked out of the meeting. Unfounded charges of voter fraud have been alleged against Indians and the state investigator who investigated the charges commented on the racial polarization in the county. Numerous disputes between whites and Indians have occurred at polling places in recent years.

Based on the evidence presented the court finds that there is racial bloc voting in Big Horn County and that there is evidence that race is a factor in the minds of voters in making voting decisions. Racially polarized voting exists in Big Horn County. After listening to and observing the witnesses at trial, it is very difficult to reach any other conclusion.

## C. Election Practices

■ The third *Zimmer* factor requires an examination of whether practices and procedures for elections (other than the at-large system of voting) enhance the opportunity for discrimination against the minority group. Questions that must be examined include:

—Whether the state or county has unusually large election districts;

—Whether single-shot voting is prohibited;

—Whether there are majority vote requirements; .

—Whether there are staggered terms;

—Whether candidates must run for numbered posts.

The final four questions serve to test whether, despite racially polarized voting and non-majority status, minorities can still elect candidates of their choice. In head-to-head contests (white candidate v. minority candidate) the minority candidate will generally lose. But if, for example, many candidates are running for two or three seats, single shot voting is permitted, there is no majority vote requirement, and the candidates do not run for numbered seats, a minority candidate can be elected under certain circumstances.

Big Horn County does not prohibit single shot voting and there is no majority vote requirement. However, terms for both the Board of Commissioners and the school boards are staggered and candidates for the Board of Commissioners run from residential districts. What this means in practice is best explained by examining recent elections for the Board of Commissioners and school board.

One seat on the three-member Board of Commissioners is up for election every two years because of the use of staggered terms. Generally elections for Board seats boil down to two candidates on the ballot. In the 1984 primary for the District # 1 seat an Indian ran against a white and with racially polarized voting, the white candidate won. The lack of a majority vote requirement and the ability to single shot vote makes no difference in head-to-head contests with voters each getting one vote only. *See Collins v. Norfolk*, 768 F.2d 572, 574 n. 4 (4th Cir.1985); *Jones v. City of Lubbock*, 727 F.2d 364, 383 (5th Cir.1984) ("staggered terms and numbered posts create head-to-head races and promote majority-minority confrontation"); *U.S. v. Dallas County Com'n.*, 739 F.2d 1529, 1536 (11th Cir.1984).

Primary elections are different when more than two candidates are on the ballot. In the 1982 primary for the Board of Commissioners District # 3 seat there was a five-way battle for the Democratic nomination. No Indian ran, but one so-called "pro-Indian" white candidate did and won the primary with 37 percent of the vote. The absence of a majority vote requirement in Big Horn County enabled the choice of Indian voters (James Ruegamer) to win the nomination of the Democratic Party. *Cf. Major v. Treen*, 574 F.Supp. 325, 339 n. 32 (E.D.La.1983) (Louisiana has majority vote requirement); *McMillan v. Escambia County, Fla.*, 748 F.2d 1037, 1044 (5th Cir. 1984) (majority vote required to win primary). Such a result is not guaranteed. It only can occur when there are multiple candidates to split the white vote. Given racially polarized voting and the likelihood of head-to-head contests in general elections, it is very difficult for a minority candidate to win election to the Board of Commissioners, and indeed, no Indian has been elected to a seat on the Board. The 1982 election is examined in greater depth below. Post–1982 campaigns reflect that white voters were educated in 1982, and head-to-head contests for the Board of Commissioners have been the rule since 1982 (except for a write-in campaign in one election).

The phenomenon is not as pronounced in school board elections because the posts are not numbered, the contests are not partisan, and in two-thirds of the elections, voters vote for two candidates for two seats. In sum, head-to-head contests are less likely. In 1984, Wayne Moccasin, an

Indian, was elected to the school board by encouraging his supporters to single shot (or bullet) vote for just him and not use their second vote. With three white candidates splitting the white vote, Moccasin was able to come in second and win one of the seats on the school board. The evidence shows that only 72 percent of the voters in a predominantly Indian precinct cast two votes as compared to 92 percent in a predominantly white precinct. In numbers this means 222 voters cast only one vote in the predominantly Indian precinct. Moccasin only won by 34 votes. Moccasin's election took place after this lawsuit was filed.

For school board elections, single shot voting and the absence of numbered seats (or residential districts) makes it possible for minority candidates to succeed, under certain circumstances. This is not the case in Board of Commissioners elections because voters only have one vote and only one seat is up for election at any one time.

Among the factors just discussed—the existence of staggered terms and residential districts dilutes Indian voting strength by promoting head-to-head contests. The situation could be much worse for Indians—the county could require majority votes and prohibit single shot voting. If that were the case, it is unlikely that either Moccasin or Ruegamer would have been elected.

Defendants criticize plaintiffs for complaining about the use of residential districts in Board of Commissioners elections, and then complaining about the absence of such districts in school board elections. It must be remembered that "[c]ourts have interpreted residency requirements as both showing evidence of dilution and showing no dilution." *U.S. v. Dallas County Com'n.,* 739 F.2d 1529, 1537 (11th Cir. 1984). The point is that the use of residential districts, like the use of numbered posts, promotes head-to-head contests which effectively establishes a majority vote requirement and negates the ability to single shot vote. On the other hand, the concern about a lack of residential districts is that there is the potential for all elected representatives to come from one geographic area. For example, all school board members could, conceivably, live in Hardin.

The final enhancement factor that must be examined is the size of the voting district. The district in this case is the entire county and it is huge (5,023 square miles), the roads are poor, and travel is time consuming. Indian candidates testified that the size of the district makes it difficult to campaign as campaign swings through two major towns require driving over 400 miles. In *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) the Supreme Court termed Burke County, Georgia a "large" county. Burke County is 831 square miles, less than ⅕ the size of Big Horn County. *See also McMillan v. Escambia County, Fla.* 748 F.2d 1037, 1044 n. 17 (5th Cir.1984) (county 657 square miles). The size of Big Horn County makes it a very difficult county in which to campaign. School District 17H is about half the size of the county and a similarly difficult place in which to campaign.

The evidence concerning these "enhancement factors" is mixed. The large size of the county and the use of staggered terms along with residential districts promotes head-to-head contests for the Board of Commissioners, making it more difficult for Indian supported candidates to successfully participate in the political process. If these procedures and practices were not in place, Indian candidates would be better able to participate in Big Horn County politics. Nevertheless, the ability to single shot vote and the lack of a majority vote requirement make it possible, under a limited set of circumstances (*i.e.* when many white candidates run), for Indian or "pro-Indian" candidates to succeed.

### D. Slating Process

If there is a slating process in a county and candidates not slated rarely win, exclusion of minority candidates from those slates limits minority access to the political process. Arguably, there are two

types of slating processes in Big Horn County—the political parties and the Bi-Partisan Campaign Committee.

Since 1983 the Democratic Party has been controlled or heavily influenced by Indians. Indians are clearly not excluded from any slating by the Democratic Party and, in fact, they dominate such processes. But the party does not generally pick candidates, they are chosen in primaries, and parties have little direct influence over actual election results.

The Bi-Partisan Campaign Committee, formed after the 1982 primary but since disbanded as a formal organization, did endorse candidates, all of whom were white, in the 1982 election. Committee members testified that their goal was to elect candidates who were more conservative than those who had won the Democratic primary. There was some testimony that revealed that at least for some committee members, the Bi-Partisan Campaign Committee was a vehicle for organizing to defeat Indian and pro-Indian candidates. Whether for philosophical or for racial reasons, Indians have not played a part in the slating decisions of the Bi-Partisan Campaign Committee. The committee no longer exists as a formal organization and the write in candidates it backed in 1982 were not successful.

The court does not find that there are slating organizations in Big Horn County that have a significant influence on elections from which Indians are excluded. While there may be groups of people who are active from election to election, there are no long standing committees that control large blocs of votes or strongly influence the election process. Indeed, the evidence is that there is a high degree of public awareness of who candidates are and voters make independent decisions in casting their ballots.

### E. Lingering Effects of Discrimination

Next the court must examine whether Indians bear the affects of discrimination in education, employment and health which hinders their ability to participate effectively in the political process. "[P]ast discrimination can seriously impair present-day ability of minorities to participate on an equal footing in the political process [and] may also lead to present solid economic disadvantages which in turn can reduce participation in political affairs." *U.S. v. Marengo County Com'n.*, 731 F.2d 1546, 1567 (11th Cir.1984). The statistics demonstrate that Indians in Big Horn County do not fare well relative to whites. Indian per capita income at $2,987 is less than half of that for whites. Indian life expectancy is 46, compared to life expectancy of 70 for whites. Unemployment among Indians at 32.6 percent is eight times that of whites. Some studies have shown unemployment well over 50 percent. Over a third of Indian households have no phone.

"Once lower socio-status ... has been shown, there is no need to show the causal link of this lower status on political participation.... 'Inequality of access is an inference which flows from the existence of economic and educational inequalities.'" *U.S. v. Dallas County Com'n.*, 739 F.2d 1529, 1537 (11th Cir.1984), *quoting Kirksey v. Board of Supervisors*, 554 F.2d 139, 145 (5th Cir.1977).

All these factors make it more difficult for Indians to participate in the political process and there is evidence linking these figures to past discrimination. Indians have lost land, had their economics disrupted, and been denigrated by the polices of the government at all levels. There was testimony of discrimination in hiring by the county. The county reports to the Equal Employment Opportunity Commission reveal that in 1980 5.5 percent of the county's employees were Indian and in 1984 the figure was eight percent. These figures are substantially below the 41 percent figure representing the portion of the over 18 population that is Indian. In 1983, when this suit was filed, only 2.3 percent of the full-time employees of the county were Indian. This disparity, by itself, would not necessarily be probative if there were not additional evidence to support a finding of

actual discrimination in hiring. Such evidence was presented. In 1984 two positions were open in the county road department and 40 Indians applied for positions but none were hired even after two white applicants offered the jobs turned them down. The absence of Indians on the county workforce is not currently due to the lack of qualified Indian candidates for job openings, for qualified Indian applicants are interested in the work. The County Attorney and members of the Board of Commissioners testified that discrimination in hiring has been a problem in the county in recent years. Progress is currently being made. In 1985 an Indian was hired as Personnel Director for the county and the county has established an affirmative action goal of 30 percent Indians in the county workforce. While this progress is commendable, it must be said that past discrimination in hiring has hindered Indian involvement in government, making it more difficult for Indians to participate in the political process.

■ Defendants have two general responses to the allegations of discrimination in this case. With respect to allegations of recent discrimination, defendants contend that Montana law is adequate to deal with it and few incidents of discrimination have been corroborated by Montana courts, the Montana Human Rights Commission, or the State Commissioner of Campaign Practices. With respect to historical discrimination, defendants contend that it is the fault of the federal government's treatment of the Indians, not the fault of the county. These arguments by defendants may be true, but there is nothing in the legislature history of the Voting Rights Act that reflects a congressional intent to remedy only the effects of discrimination caused by state or local government in states with weak civil rights laws. Proof that past and present discrimination hampers political involvement by Indian voters is relevant in this case, regardless of the source of such discrimination and regardless of other remedies which may exist.

■ Another issue raised by defendants is that Indians have overcome the effects of discrimination because their rates of voter registration and voter turnout are comparable to those of whites. Registration levels, as a result of the voter registration campaigns in the 1980's are now fairly comparable. Turnout figures, however, vary with recent elections demonstrating lower Indian turnout. In the 1985 school board election, 52 percent of white voters turned out while the figure for Indians was only 34 percent. In the 1984 primary, turnout among white voters was 65 percent; among Indian voters it was 35 percent. Such figures show that effects of past discrimination still linger. *Cf. U.S. v. Dallas County Com'n*, 739 F.2d 1529, 1538 (11th Cir.1984) (registration levels similar, turnout not).

Ultimately, in analyzing this factor, the question is whether past and present discrimination against Indians makes it more difficult for Indians to participate in the political process. Such a showing has been made here. Although many highly educated, competent, and articulate Indians testified at trial, most Indians—due in part to unemployment, poor education and low income—are not integrated into the economic mainstream of the county making their political involvement less likely. The blame for these problems may fall largely on the federal government, as defendants suggest, but it should not fall on Indians themselves. Reduced participation and reduced effective participation of Indians in local politics can be explained by many factors, perhaps including tribal politics (discussed below), but the lingering effect of past discrimination is certainly one of those factors.

### F. Racial Appeals in Campaigns

■ Differences between Indians and whites come up frequently in Big Horn County political campaigns. Generally speaking, Indians live on tribal reservations and whites live elsewhere, so their geographic interests often differ. Some Indians are exempt from paying certain

taxes that white voters do pay, a fact frequently brought up during campaigns.

It is very difficult to sort out those issues in campaigns that should be characterized as racial appeals and those that may involve legitimate differences between the interests of Indians and whites. Unlike plaintiffs, this court does not consider every discussion of or question about the taxation issue to be a racial campaign appeal. Taxes, of course, are very relevant issues in political campaigns at all levels, and because certain taxes are not paid by most Indians, questions about the representation of people who do pay those taxes will be raised in campaigns. It is true, however, that white voters harbor a resentment over this issue, making white support for Indian candidates unlikely. In analyzing the evidence, there is little support for a finding that overt racial appeals have dominated campaigns, but subtle appeals do seem to be part of the process, sometimes masked behind discussions of Indian-white relations.

That race is an issue in campaigns was demonstrated by the testimony of Windy Boy. In 1984, as chairman of the Democratic Party, she participated in a candidate forum sponsored by the Chamber of Commerce for candidates for the Board of Commissioners. Her role was to screen written questions presented by the audience. One of the ground rules for the forum, Windy Boy testified, was that questions with the word Indian in them were to be censored and not used. The evidence concerning recent campaigns in Big Horn County demonstrates that race is an issue and subtle racial appeals, by both Indians and whites, affect county politics.

### G. Election of Minority Candidates

■ It is axiomatic that if Indian voters are routinely electing candidates of their choice, no violation of Section 2 can be made out. A showing of electoral success can negate findings in favor of plaintiffs on the other *Zimmer* factors. However, the election of a few minority candidates is not dispositive. *E.g. U.S. v. Marengo County*

*Com'n.*, 731 F.2d 1546, 1551–52 (11th Cir. 1984) (black candidate elected as County Coroner and black candidate reelected to school board; trial court finding of no Section 2 violation clearly erroneous); *Zimmer v. McKeithen*, 485 F.2d 1297, 1307 (5th Cir.1973); 1982 U.S.Code Cong. and Ad. News at 207 n. 115.

Defendants point to the election of four individuals in the last four years as proof that Indians have access to the political process and can and do elect candidates of their choice. Those four individuals are: Janine Windy Boy, former Chairman of the Big Horn County Democratic Party; James Rougamer, a member of the Big Horn County Board of Commissioners; Clarence Belue, the County Attorney of Big Horn County; and Wayne Moccasin, of the Board of Trustees for school districts 17H and 1. Moccasin and Windy Boy are Indian. Rougamer and Belue are white.

The impact that Indians have had on the Democratic Party in recent years clearly demonstrates access and ability to participate in partisan politics. Plaintiffs contend this does not translate into influence in electoral politics because political parties in Big Horn County do not have a powerful role in appointing or nominating candidates. Plaintiffs cite as proof of this, the fact that when there was a vacancy on the Board of Commissioners, none of the individuals suggested by the Democratic Party was appointed. The pattern repeated itself when there was a vacancy on the school board. Additionally, plaintiffs contend that open primaries mean that the primary process, not the political party, determines who runs for office. Until this year, no Indian had received his or her party's nomination for the Board of Commissioners. It goes without saying that electing candidates to party posts, as Indian voters have done, is not the same as electing candidates to public office. Moreover, it should be noted that party officials are elected by precinct representatives who are elected by district, showing the election structure makes a difference. *See McMillan v. Escambia County*, 748 F.2d 1037, 1045 (5th

Cir.1984). Nevertheless, control of the Democratic Party by Indians does show access to the political process.

As discussed previously, Wayne Moccasin, an Indian, was elected to the school board in 1984. Moccasin received votes from an estimated 47 percent of the voters in that election, but it was enough to win due to a single shot voting by his supporters. Moccasin's election was in part a result of unique circumstances in 1984, as three white candidates split the white vote. It should be noted, though, that Moccasin was able to attract some white support as he emerged from Hardin with 123 votes, more votes by far than other Indian candidates have received from Hardin voters. In 1985 the two Indian candidates for school board—Theresa Plentyhoops and Frank Backbone—were soundly defeated, each receiving 28 percent of the vote. Plentyhoops and Backbone received 55 and 49 votes respectively from Hardin voters.

Two white candidates have been elected in recent county elections and are considered, in the parlance of Big Horn County politics, "pro-Indian." These officials, Commissioner James Ruegamer elected in 1982 (a plaintiff in this action), and County Attorney Clarence Belue, elected in 1984, both received substantial support from Indian voters and both have been active representatives of the Indian community pushing the county to hire and appoint more Indians to county positions. While the elections of Ruegamer and Belue do not constitute elections of minority candidates, they certainly indicate that Indian voters have influenced elections and have elected candidates of their choice. They also may indicate that pro-Indian whites can sometimes attract enough white votes to win, while Indians cannot.

Plaintiffs contend the election of Ruegamer and Belue are aberrations and do not demonstrate a permanent ability of Indians to influence elections. Ruegamer benefited from the large number of candidates in the primary race and a relatively low white voter turnout compared to the Indian voter turnout. With four other candidates splitting the white vote, and Ruegamer getting most of the Indian vote, Ruegamer was able to win the primary with 37 percent of the vote. There was a very strong reaction to the Ruegamer nomination in the white community and a write-in campaign was started to oppose Ruegamer as there was no Republican nominee. Adam Seader, who came in a close second to Ruegamer in the primary, was the write-in candidate, Ruegamer barely survived the write-in challenge, winning with 52 percent of the vote in the 1984 general election. Rarely do candidates who are unopposed on the ballot have such a difficult time winning elections.

Ruegamer's nomination resulted from multiple candidates in the primary. This did not repeat itself in 1984 when an Indian (Patrick Doss) ran against a white (Alvin Torske) for the Democratic nomination for Commissioner. Torske won the primary handily despite being outspent by Doss, who testified at trial and appeared to be articulate and a strong candidate. Racially polarized voting existed in this election, a voting pattern which cannot be explained by campaign expenditures or qualifications of candidates. Doss received only 45 votes from Hardin and 35 percent of the vote overall. Doss testified that when people learned he was an Indian, that became the principal issue in the election campaign. Torske went on to win the November election.

In the most recent primary (according to post-trial motions) an Indian who was unopposed received the Democratic nomination for Board of Commissioners and will face a Republican opponent, who is white, in November.

Clarence Belue was elected County Attorney in 1984 after receiving the Democratic nomination from the party when a vacancy resulted. Belue, who is white, emerged with 51.1 percent of the two-party vote. Belue became more vocally supportive of Indian rights after the election and, according to his testimony, has become ostracized in the white community because of it.

Indian voters have influenced elections during this decade and three candidates have been elected to county positions or school board with substantial Indian voting support. A key question in this case becomes whether the success of Ruegamer, Belue, and Moccasin in recent elections is sufficient to overcome the findings of racially polarized voting and discrimination against Indians. The court finds that it does not. Of the numerous Indians who have run for county or school board positions in Big Horn County since 1924, when Indians were given the right to vote, only one has been successful. Ruegamer, not an Indian but clearly the choice of Indian voters, was successful because of a five-way primary and because his only general election opposition was from a write-in candidate. These unique circumstances, which have not repeated themselves, do not demonstrate an ongoing ability of Indians to overcome racially polarized voting and influence the outcome of elections.

Similarly, the election of Belue is not reflective of an ongoing ability of Indians to affect elections. Belue was a civic leader in the white community when he ran for County Attorney. He was not as vocally "pro-Indian" as Ruegamer and he testified that his actions as County Attorney have cost him support in the white community.

## H. Other Factors

There are three other factors this court must consider: the justification for the at-large system; the responsiveness of the government to minority needs; and, a unique question raised by this case, the impact of dual sovereignty on the election process.

██ The *Zimmer* factors include justification for the at-large system and responsiveness of government to minority needs, but these factors play a different, less important role in Section 2 cases than in constitutional litigation. *U.S. v. Marengo County Com'n.*, 731 F.2d 1546, 1566 (11th Cir.1984).

At-large elections are in place throughout Montana and for a time were required by the state constitution. A policy reason for at-large elections—concern for representation of countywide interests rather than parochial interests—clearly exists. It deserves mention though that twice elected county commissions established as part of a constitutionally structured government review process have recommended abolition of the at-large system, so these commissions apparently did not find the policy reasons favoring at-large elections to be compelling in Big Horn County. Additionally, two Montana counties have voluntarily abandoned at-large elections and adopted districting systems. As other courts have noted, justifications for at-large systems, ultimately have little probative value in Section 2 cases. *Jones v. City of Lubbock*, 727 F.2d 364, 383 (5th Cir. 1984).

██ Similarly, the responsiveness factor is of limited relevance because Section 2 is concerned with participation in government, not provision of governmental services, and because measuring responsiveness is highly subjective, and Congress wanted to emphasize objective factors in Section 2 cases. *U.S. v. Marengo County Com'n.*, 731 F.2d 1546, 1572 (11th Cir. 1984). However, "[u]nresponsiveness is relevant under the results test ... if the plaintiffs choose to make it so." *Id.;* 1982 U.S.Code Cong. and Ad.News at 207 n. 116.

Defendants contend that Big Horn County is characterized by growing responsiveness to Indian concerns. The county is without doubt more responsive to the demands for hiring and appointment of Indians than it was before this suit was filed. Courts are often skeptical of conduct which immediately precedes a trial, wondering whether such responsiveness will continue at the termination of the litigation. *Jones v. City of Lubbock*, 727 F.2d 364, 382 (5th Cir.1984). While there is growing responsiveness, this is not a factor which weighs heavily in favor of defendants under Section 2 analysis.

██ Finally, the court must consider whether the existence of dual sovereignty

affects the totality of the circumstances in Big Horn County. Indians participate in both tribal government and local government and defendants contend that one explanation for reduced Indian political participation is that they have concentrated their efforts on tribal rather than local politics. Plaintiffs dispute this, contending it is a thinly veiled claim that Indians are apathetic, something which the evidence does not reflect. *Cf. U.S. v. Dallas County Com'n.*, 739 F.2d 1529, 1536 (11th Cir. 1984).

The court does not find that dual sovereignty explains the inability of Indians to participate fully in the political processes of Big Horn County. Indians, for example, are as concerned about schools as white citizens, and a good number have run for school board over the last twenty years. There is no evidence that interest in tribal affairs has in anyway lessened Indian parents' involvement in their children's education. Racially polarized voting and the effects of past and present discrimination explain the lack of Indian political influence in the county, far better than existence of tribal government.

## I. Educational Issues

An examination of a local school system is appropriate in any voting rights case, and is especially appropriate when a school board election system is challenged.

The schools in district 17H are operated on a freedom of choice assignment plan, with students free to attend any school they want. This has meant that the school at Crow Agency is 100 percent Indian, according to the Superintendent of Schools, and white students who live nearby are bused into Hardin, fifteen miles away, to attend school. Harvey Pitsch, a school board member, buses his child to school in Hardin even though he lives close to the Crow Agency school. Some Indian children are also bused into Hardin where the school population is about half white and half Indian.

Testimony revealed that in those schools that are integrated, Indians are often tracked in the lower classifications. This was testified to by Dale Old Horn, who holds a masters degree from MIT and who unsuccessfully ran for school board, and by Sharon Peregoy who attended school in Hardin and taught in the school system. Her testimony was that during high school Indians were concentrated in vocational courses. She also testified that despite her training and the fact that she has served in high level positions in the Montana Teachers Association, many of her colleagues look down on her as a teacher, she believes, because of her race. She further testified that there are few Indian teachers in the school system. Other testimony confirmed that.

There have been problems between Indian parents and school officials concerning expenditures of Johnson-O'Malley funds—federal funds earmarked for Indian education. At one point school officials refused to meet with parents, and funding was temporarily cutoff.

Finally, there was testimony that Indians have complained to the school board about high dropout rates among Indian students, and nothing has been done to examine or address the problem. Indifference to the concerns of Indian parents is perhaps best reflected by the fact that many of the school board members have never visited the schools they govern that are located on Indian reservations.

Reduced educational opportunities for Indians make it more difficult for them to participate in the political process. English is a second language for many Indians, further hampering participation.

That there are problems in the school system is not surprising as school boards everywhere face difficult challenges. It may be that plaintiffs have highlighted isolated problems in the presentation of their case, but the evidence presented nevertheless reflects that the particular problems of Indian students have not been given the attention they deserve, and perhaps have been compounded, by the school system as it has been operated.

## V. TOTALITY OF THE CIRCUMSTANCES

■■ In analyzing the above factors it must be remembered that they should not be used as a point-counting device. "The failure of plaintiff to establish any particular factor is not rebuttal evidence of non-dilution. Rather, [Section 2] requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is ... minimized or canceled out." U.S.Code Cong. & Admin.News at 207 n. 118.

Upon a review of the totality of the circumstances in this case, the court finds and holds that plaintiffs have proved a violation of Section 2. The at-large system of voting gives Indians "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). Indian participation in the political process has been further hampered by official acts of discrimination that have interfered with the rights of Indian citizens to register and to vote; past discrimination against Indians in hiring and appointments to boards and commissions; and reluctance to appoint Indians as election judges and deputy registrars of voters. The immense size of Big Horn County, along with the effects of discrimination in employment, health, and education, are additional barriers to full Indian participation in the electoral process.

It is not impossible for Indians to overcome these barriers, as Wayne Moccasin demonstrated in 1984, but it is very difficult. The testimony at trial revealed that there is substantial polarization in Big Horn County and Indian candidates can rarely count on receiving white votes.

The analysis of at-large systems of voting is never an easy task. *Jones v. City of Lubbock,* 727 F.2d 364, 383 (5th Cir.1984); *see also Velasquez v. City of Abilene, Tex.,* 725 F.2d 1017, 1028 (5th Cir.1984) (Higginbotham, J. concurring). It can never be said with certainty that a particular

system of voting dilutes the votes of minority citizens, but Congress has directed this court to analyze a number of objective factors, which Congress and the courts have found strongly probative of vote dilution. Importantly, a finding of dilution under Section 2 does not require a finding of any intentional discrimination by past or present elected officials in the use of the at-large system. Instead, vote dilution is shown, and has been shown in this case, by proof of a confluence of factors, that each in their own way make it difficult for minorities to fully participate in the political system. Especially probative in this case are the findings of recent interference with the right of Indians to vote and the polarized nature of campaigns and voting patterns in the county.

In examining the totality of the circumstances, it is appropriate to step away from a wooden application of the *Zimmer* factors and the caselaw, and to consider certain political realities in Big Horn County. The evidence demonstrated a strong desire on the part of some white citizens to keep Indians out of Big Horn County government. Indians for the most part have not been hired as public employees and have not been considered for appointment to boards and commissions. While some progress has been made on this front since this suit was filed, the effects on Indians of being frozen out of county government remain and will continue to exist in years to come.

The effort to keep Indians out of government continued when voting registration was made difficult and the right to vote, in some cases, was denied. Aware that Indian candidates might succeed in multi-candidate contests, there is some evidence that strategists interested in preserving the status quo did what they could to encourage head-to-head contests, rather than the five-way free-for-all in 1982 that produced a so-called "pro-Indian" white elected official.

It is clear that this is precisely the kind of case where Congress intended that at-large systems be found to violate the Voting Rights Act. While white candidates

cannot ignore the existence of Indian voters because of the potential they have to influence elections when white turnout is low and numerous candidates are on the ballot, with a well thought out strategy, white candidates can effectively minimize or cancel out the Indian vote, as demonstrated, for example, in the 1984 primary and election for Board of Commissioners. The effect is that candidates can be elected without Indian support and can survive politically even when they ignore the interests and problems of the Indian community. This is as true for the school boards as it is for the Board of Commissioners.

At-large elections in Big Horn County violate Section 2 of the Voting Rights Act. A new system of elections must be adopted. It must be remembered, however, that Indians are not entitled to proportional representation and not entitled to a guaranteed number of seats on whatever type of governing board may be established to take the place of the current systems. It should also be remembered that the finding that the current systems violate the Voting Rights Act does not prohibit the mixture of an at-large system and a districting system as a substitute system of voting. *See e.g. James v. City of Sarasota, Fla.*, 611 F.Supp. 25 (M.D.Fla.1985) (3 by district, 2 at-large system approved); *but see McMillan v. Escambia County, Fla.*, 559 F.Supp. 720, 726 (N.D.Fla.1983) (5 by district, 2 at-large system rejected). Defendants are free to propose whatever type of system they consider appropriate, so long as it does not violate the Voting Rights Act. 42 U.S.C. § 1973a(c). This court's authority to modify a proposed system is limited to curing any statutory violations. *Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 1522, 71 L.Ed.2d 725 (1982). The decision of this court does not guarantee Indians proportional representation because as before and as should be the case, the exact makeup of the governing bodies for Big Horn County and local school boards—including the race, partisan affiliation, and residency of elected officials—will depend on the quality of candidates, the quality of the campaigns, and, ultimately, the decisions of the voters of Big Horn County.

## VI. REMEDIES

"A district judge adopting districting plans to replace an invalidated at-large system must adhere to the middle of the road." *Jones v. City of Lubbock*, 727 F.2d 364, 386 (5th Cir.1984). It must be remembered that "[a]pportionment is principally a legislative responsibility [and] a district court should ... afford to the governmental body a reasonable opportunity to produce a [statutorily] permissible plan." *Id.* at 387.

Defendants are hereby ordered to propose a remedy to this court, consistent with the caselaw, that requires the election of some or all Commissioners and school board members by district. The court believes a new system can be put in place for the 1986 elections (1987 for school board) and would instruct defendants to propose a timetable for implementation with that in mind. Defendants shall submit a proposal by June 30, 1986. If need be, interim remedies, alternative remedies, or revised election schedules may be proposed. The court will schedule a hearing soon thereafter to ensure the proposed voting system complies with Section 2. *Edge v. Sumter Co. School Dist.*, 775 F.2d 1509, 1510–11 (11th Cir.1985) (a hearing must be held). Plaintiffs will, of course, be given an opportunity to comment on the proposal. The court believes time is of the essence and seeks to have a remedy in place as soon as possible.

Plaintiffs also seek damages in this case. The court has not found any precedent in recent voting rights case for awarding plaintiffs damages. *Olagues v. Russoniello*, 770 F.2d 791, 805 (9th Cir. 1985) (no damages remedy under 42 U.S.C. § 1973). Injunctive relief is the universal remedy when plaintiffs prevail in Voting Rights Act cases. Moreover, plaintiffs did not prove any actual damages at trial or any constitutional violations. Finally, it should be noted that though there was testimony that Indians were denied the

right to register and vote, there was no testimony that the named plaintiffs had their rights interfered with, with the possible exception of Clo Small who apparently did vote, but at a different location than her husband.